# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Sofia Urquizo,<br><br>      Plaintiff,<br><br>v.<br><br>Community Loan Servicing, LLC, f/k/a Bayview Loan Servicing, LLC; Nationstar Mortgage LLC d/b/a Mr. Cooper; and FCI Lender Services, Inc.,<br><br>      Defendants. | Civil Action No. 1:24-cv-00909 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

Leslie Wybiral, Esq.
QUEENS LEGAL SERVICES
89-00 Sutphin Blvd., 5th Floor
Jamaica, NY 11435
347-592-2145 (direct)
347-592-2200 (main)
lwybiral@lsnyc.org

*Attorneys for Plaintiff Sofia Urquizo*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS ........................................................................ 2

    A. Plaintiff Sofia Urquizo ..................................................... 2

    B. Establishing Ms. Urquizo As a Successor-In-Interest...................... 3

    C. The Agreement ................................................................ 4

    D. Servicing Transfers and Refusals to Honor the Agreement ............. 6

        1. The June 8, 2022 QWR/NOE................................................ 6

        2. The July 18, 2022 NOE .................................................... 7

        3. The April 20, 2023 QWR/NOE.............................................. 8

        4. The June 30, 2023 QWR/NOE.............................................. 9

    E. The Foreclosure Action .................................................... 10

I. Standard of Review – Fed. R. Civ. P. 12(b)(6)........................................ 10

II. Argument ...................................................................................... 11

    A. *Colorado River* Abstention Is Not Applicable ................................. 11

        1. The Foreclosure Action Is Not Parallel to the Federal Case .......

                 12

            a. There Is No Identity of Parties Between the
                Foreclosure Action and the Federal Case............................. 13

            b. The Issues In the Foreclosure Action and In the
                Federal Case Are Not Substantially Similar.......................... 16

        2. Even If the Cases Were Parallel, Abstention Is
           Inappropriate Because the *Colorado River* Factors
           Weigh In Favor of This Court Retaining Jurisdiction................. 19

            a. Factor One – Whether the Controversy Involves a Res ........ 19

            b. Factor Two – Convenience of the Federal Forum................. 20

i

      c.   Factor Three – Risk of Piecemeal Litigation.........................   20

      d.   Factor Four – Order of Filing ................................................   20

      e.   Factor Five – Rule of Decision..............................................   21

      f.   Factor Six – Protection of Plaintiff's Federal Rights ............   21

B.  Ms. Urquizo Has Adequately Alleged Violations of RESPA
     Upon Which Relief Can Be Granted ................................................   22

    1.  RESPA and Regulation X....................................................   23

    2.  The CFPB Express States That "Servicing"
       Includes Loss Mitigation ................................................   24

    3.  Defendants Failed to Adequately Respond to
       Ms. Urquizo's QWRs/NOEs ................................................   30

      a.   June 8, 2022 – First QWR/NOE ................................   30

      b.   July 18, 2022 – Second QWR/NOE ......................................   31

      c.   April 20, 2023 – Third QWR/NOE
           June 30, 2023 – Fourth QWR/NOE......................................   31

    4.  Ms. Urquizo Sufficiently Alleges Actual Damages
       That Were Directly and Proximately Caused by
       Defendants' Actions ................................................   34

    5.  Ms. Urquizo Sufficiently Alleges Statutory Damages ................   36

C.  Ms. Urquizo Sufficiently Alleges a Breach of Contract Claim.........   37

    1.  The Agreement Is a Binding Contract.........................................   37

    2.  Fannie Mae Permits Simultaneous Assumption
       and Modification ................................................   39

    3.  Mr. Cooper and FCI Are Bound By the Agreement ..................   41

    4.  Defendants' Breached the Agreement.........................................   42

D.  Ms. Urquizo Is Entitled to Specific Performance As A Remedy ......   42

CONCLUSION ................................................................   43

## TABLE OF AUTHORITIES

***Cases***                                                                     **Page**

*Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40 (2d Cir. 1991) .............................   11

*Akkus v. Rocket Mortg., LLC*, No. 22-2933, 2024 WL 473733
  (D. Md. Feb. 7, 2024)........................................................................................   36

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York*, 762 F.2d 205
  (2d Cir. 1985)...............................................................................................   12, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................   11

*Berene v. Nationstar Mortg., LLC*, 800 F. App'x 756 (11th Cir. 2020) ..................   23

*Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325
  (2d Cir. 1986)................................................................................................   21

*Bongiovanni v. PennyMac Corp.*, No. 19-CV-3260, 2021 WL 1193043
  (E.D.N.Y. 2021) ..........................................................................................   17

*Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 41 N.Y.2d 397
  (1977) ............................................................................................................   37

*Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976) ................   *passim*

*Cortes-Goolcharran v. Rosicki, Rosicki & Assocs. PC*, No. 17-CV-3976,
  2018 WL 3748154 (E.D.N.Y. Aug. 7, 2018).........................................................   14

*Dalzell Mgmt. Co., Inc. v. Bardonia Plaza, LLC*, 923 F. Supp. 2d 590
  (S.D.N.Y. 2013) ...........................................................................................   22

*Day v. Union Mines Inc.*, 862 F.2d 652 (7th Cir. 1988) ...........................................   12

*DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627
  (S.D.N.Y. 2011) ...........................................................................................   13

*Diaz v. Residential Credit Sols., Inc.*, 965 F. Supp. 2d 249 (E.D.N.Y. 2013) ..........   10

i

*DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104 (2d Cir. 2010) .............................. 10

*Dittmer v. Cnty. of Suffolk*, 146 F.3d 113 (2d Cir. 1998) .......................................... 12

*Dunkin' Donuts Franchised Rests. LLC v. Rijay, Inc.*, No. 06 CIV 8237,
   2007 WL 1459289 (S.D.N.Y. May 16, 2007) ....................................................... 22

*Estrada v. Caliber Home Loans, Inc.*, 172 F. Supp. 3d 1108 (C.D. Cal. 2016) ....... 41

*Fezzani v. Bear, Stearns & Co., Inc.*, 716 F.3d 18 (2d Cir. 2013) .......................... 11

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*,
   862 F. Supp. 2d 170 (E.D.N.Y. 2012) ................................................................. 15

*Frydman v. Verschleiser*, 172 F. Supp. 3d 653 (S.D.N.Y. 2016) ............................ 13

*Harris v. Nationstar Mortg. LLC*, No. 19-3251, 2020 WL 4698062
   (D. Md. Aug. 13, 2020) ....................................................................................... 24

*Hernandez v. J.P. Morgan Chase Bank, N.A.*, No. 14-24265-CIV,
   2016 WL 3982496 (S.D. Fla. July 22, 2016) ...................................................... 23

*HomeQ Servicing Corp. v. Hauf*, No. 4:06–CV–83, 2007 WL 196857
   (M.D. Ga. Jan. 23, 2007) ..................................................................................... 41

*Houston v. U.S. Bank Home Mortg. Wis. Servicing*, 505 F. App'x 543 n.6
   (6th Cir. 2012) ...................................................................................................... 35

*In re Asbestos Litig.*, 963 F. Supp. 247 (S.D.N.Y. 1997) ......................................... 18

*In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849, 2006 WL 3193709
   (E.D.N.Y. 2006) ............................................................................................. 11, 17

*Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526 (E.D.N.Y. 2015) ........ 34

*Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100 (2018) ...................................... 37–39

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ....................................... 11

*Lanton v. Ocwen Loan Servicing, LLC*, 793 F. App'x 398 (6th Cir. 2019) .............. 35

*Lewis v. Bank of Am.*, No. CV 13–7717, 2013 WL 7118066
  (C.D. Cal. Dec. 18, 2013) ........................................................................ 41

*Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712 (S.D. Ohio 2014) ............... 35

*McClain v. CitiMortgage, Inc.*, No. 15 C 6944, 2016 WL 269568
  (N.D. Ill. Jan. 21, 2016) ......................................................................... 26

*McCrobie v. Palisades Acquisition XVI, LLC*, 359 F. Supp. 3d 239
  (W.D.N.Y. 2019) ...................................................................................... 11, 17

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ............ 13, 19, 21–22

*Naimoli v. Ocwen Loan Servicing, LLC*, 22 F.4th 376 (2d Cir. 2022) ................... 29

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*,
  673 F.3d 84 (2d Cir. 2012) ....................................................................... 12

*Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 F. App'x 905 (11th Cir. 2016) ......... 23, 26

*Page v. Forster & Garbus, LLP*, No. 18-CV-3611, 2019 WL 5696108
  (E.D.N.Y. June 17, 2019) ......................................................................... 17

*Potente v. Cap. One, N.A.*, No. 16-CV-3570, 2018 WL 1882848
  (E.D.N.Y. Apr. 19, 2018) .......................................................................... 16

*RCN Telecom Svcs., Inc. v. 202 Centre St. Realty LLC*, 156 Fed. App'x 349
  (2d Cir. 2005) ........................................................................................... 42

*Roth v. CitiMortgage Inc.*, 756 F.3d 178 (2d Cir. 2014) ......................................... 23

*Sheerbonnet, Ltd. v. Am. Express Bank Ltd.*, 17 F.3d 46 (2d Cir. 1994) ................. 13

*Shields v. Murdoch*, 891 F. Supp. 2d 567 (S.D.N.Y. 2012) ................................... 12

*Sitgraves v. Fed. Home Loan Mortg. Corp.*, 265 F. Supp. 3d 411
  (S.D.N.Y. 2017) ...................................................................................... 16

iii

*Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409 (2001) ........................... 42

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008).................. 11

*Suffolk Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 829 F. Supp. 2d 82
  (E.D.N.Y. 2010)......................................................................... 18

*Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254 (S.D.N.Y. 2017)...................... 26–27

*Tanasi v. CitiMortgage, Inc.*, 257 F. Supp. 3d 232 (D. Conn. 2017) ..................... 35–36

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001)..................................... 10

*Vill. of Westfield v. Welch's*, 170 F.3d 116 (2d Cir. 1999) ........................... 20

*Walker v. PHH Mortg. Corp.*, No. 22-cv-23276, 2023 WL 1778514
  (S.D. Fla. Feb. 6, 2023)................................................................ 13

*Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014).......................... 24

*Winslow v. Forster & Garbus, LLP*, No. CV 15-2996, 2017 WL 6375744
  (E.D.N.Y. Dec. 13, 2017)................................................................ 17

*Woodford v. Cmty. Action Agency of Greene Cnty., Inc.*, 239 F.3d 517
  (2d Cir. 2001)..................................................................... 19, 21

*Wright v. Litton Loan Servicing LP*, No. 05–02611, 2006 WL 891030
  (E.D. Pa. Apr. 4, 2006)................................................................ 41

*Yepez v. Specialized Loan Servicing, LLC*, No. 18 C 7422, 2019 WL 2644255
  (N.D. Ill. June 27, 2019) ............................................................. 26

*Yeboah v. Bank of America, N.A.*, No. 3:18-cv-2020, 2019 WL 3388045
  (D. Conn. July 26, 2019) ............................................................. 14

### *Statutes and Regulations*

12 C.F.R. § 1024.35 ............................................................... *passim*

iv

12 C.F.R. § 1024.35(a) ..................................................................... 23

12 C.F.R. § 1024.35(b) ..................................................................... 25

12 C.F.R. § 1024.35(b)(7) ............................................................... 25

12 C.F.R. § 1024.35(b)(8) ............................................................... 25, 32

12 C.F.R. § 1024.35(b)(9) ............................................................... 25

12 C.F.R. § 1024.35(b)(10) ............................................................. 25

12 C.F.R. § 1024.35(b)(11) ............................................................. 25, 29–30

12 C.F.R. § 1024.35(d) ..................................................................... 28

12 C.F.R. § 1024.35(e) ..................................................................... 28

12 C.F.R. § 1024.35(e)(3)(C) ......................................................... 31 fn.

12 C.F.R. § 1024.35(g)(1)(iii) ......................................................... 30 fn.

12 C.F.R. § 1024.38 ......................................................................... 28 fn., 33, 37

12 C.F.R. § 1024.38(a) ..................................................................... 32–33

12 C.F.R. § 1024.38(b)(4) ............................................................... 28, 32–33

12 C.F.R. § 1024.39 ......................................................................... 25

12 C.F.R. § 1024.41 ......................................................................... 2, 24, 37

12 C.F.R. § 1024.41(g) ..................................................................... 25

12 C.F.R. § 1024.41(h) ..................................................................... 24

v

12 C.F.R. § 1024.41(j) ................................................................. 25

12 C.F.R. § 1024.41(k)(5) .......................................................... 27 fn., 30

12 U.S.C. § 2605 ....................................................................... 24, 34, 36

12 U.S.C. § 2605(e) ................................................................... 37

12 U.S.C. § 2605(f) .................................................................... 2, 24

12 U.S.C. § 2605(f)(1) ............................................................... 36

12 U.S.C. § 2605(k)(1)(C) .......................................................... 23

89 Fed. Reg. 10696 .................................................................... 25

89 Fed. Reg. 60204 .................................................................... 26

89 Fed. Reg. 63295 .................................................................... 33

89 Fed. Reg. 63297 .................................................................... 33

81 Fed. Reg. 72160 .................................................................... 24

81 Fed. Reg. 72281 .................................................................... 25

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 ...................................... 23

Real Estate Settlement Procedures Act of 1974, as amended (RESPA),
   12 U.S.C. §§ 2601, *et seq* ...................................................... *passim*

## Other Authorities

CPLR § 3408 .............................................................................. 39

Fed. R. Civ. P. 12(b)(6) .............................................................. 10–11

Restatement (Second) of Contracts § 24 ................................................................. 39

Section F-1-17, Fannie Mae Servicing Guide ......................................................... 39

Consumer Financial Protection Bureau (CFPB) Bulletin 2013-12 ......................... 40

Plaintiff Sofia Urquizo ("Ms. Urquizo") submits this memorandum of law in opposition to the motions of Defendant Community Loan Servicing, LLC, f/k/a Bayview Loan Servicing, LLC ("CLS"), Nationstar Mortgage LLC d/b/a Mr. Cooper ("Nationstar") and FCI Lender Services, Inc. ("FCI") (collectively "Defendants") to dismiss Ms. Urquizo's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6) (collectively, the "Motions"). For the reasons stated below, all the causes of action in the First Amended Complaint are properly pled and should not be dismissed.

## PRELIMINARY STATEMENT

Ms. Urquizo, seeks relief from Defendants' unlawful actions, which have violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601–2617, and Regulation X, 12 C.F.R. Part 1024, RESPA's primary implementing regulation. These violations stem from Defendants' failure to honor a legally binding agreement for the simultaneous assumption and modification of Ms. Urquizo's mortgage loan (the "Agreement"). In addition to these federal claims, Ms. Urquizo has also brought state law claims for breach of contract and specific performance. As a result of Defendants' malfeasance, Ms. Urquizo has endured significant financial hardship and emotional distress, with her home now facing the immediate threat of foreclosure.

The Defendants' Motions should be denied in their entirety. First, Ms. Urquizo has adequately pled multiple violations of RESPA, including Defendants' repeated failure to respond to Qualified Written Requests (QWR) and Notices of Error (NOE), as required by 12 C.F.R. § 1024.35. These failures directly relate to Defendants' servicing obligations, which include properly addressing inquiries about a borrower's mortgage loan. Contrary to Defendants' arguments, these issues fall squarely within the scope of RESPA's protections. Additionally, Defendants' refusal to honor the Agreement, which Ms. Urquizo accepted in good faith, constitutes

a breach of their obligations under 12 C.F.R. § 1024.41, which governs loss mitigation procedures. Ms. Urquizo is entitled to both actual and statutory damages. She has suffered actual damages, including financial harm and emotional distress, caused by Defendants' failure to perform a reasonable investigation and properly respond to her QWRs/NOEs. In addition, Defendants' demonstrated pattern of noncompliance entitles her to statutory damages 12 U.S.C. § 2605(f).

Defendants' argument that no contract exists between the parties is meritless, as Ms. Urquizo has adequately alleged the existence of a binding agreement, and both the original and successor servicers are bound by its terms. Specific performance is the only adequate remedy, as the Agreement is uniquely tailored to Ms. Urquizo's circumstances and the timing in which it was offered. Monetary damages would not sufficiently compensate for the harm she faces, particularly the risk of losing her home–a loss that cannot be fully remedied through financial relief.

In light of these well-pled allegations of ongoing servicing misconduct, financial harm, and emotional distress, Defendants' Motions fail under the applicable legal standards. Ms. Urquizo respectfully requests that the Court deny Defendants' Motions in full.

## STATEMENT OF FACTS

### A. Plaintiff Sofia Urquizo

Ms. Urquizo is a longtime homeowner residing in a two-family home located at 453 Beach 43rd Street, Far Rockaway, New York. First Amended Complaint ("FAC") at ¶ 20. She has lived in this home for almost twenty years with her two children and elderly parents. *Id*. In 2004, her late husband, Miguel Mena, purchased the property with 95% financing, secured by two mortgages totaling $416,700. *Id*. ¶ 22. Initially, Mr. Mena was the sole borrower on both mortgages. *Id*. ¶ 23. In December 2004, he transferred title to both himself and Ms. Urquizo as husband and wife. *Id*. ¶ 24. In 2006, Mr. Mena entered into a Consolidation, Extension, and Modification Agreement

2

(CEMA) with JPMorgan Chase Bank, N.A. (Chase) regarding the primary mortgage. *Id*. ¶ 25. As part of this CEMA, Ms. Urquizo was formally identified as a borrower and included as a signatory on the CEMA. *Id*.

In May 2013, Mr. Mena and Ms. Urquizo again modified the primary mortgage with Chase. *Id*. ¶ 26. The family continued to reside in the home until Mr. Mena's untimely death in 2014. *Id*. ¶ 27. Following his death, Ms. Urquizo faced significant financial strain, as Mr. Mena had been the household's primary earner. *Id*. Despite her efforts to increase her income by working multiple jobs, she struggled to keep up with the mortgage payments. *Id*.

**B. Establishing Ms. Urquizo As a Successor-In-Interest**

After Mr. Mena's death, despite her designation as a borrower in both the CEMA and the 2013 loan modification, Chase refused to communicate with Ms. Urquizo about the mortgage. *Id*. ¶ 29. The bank asserted that she was not a borrower on the loan, hindering her attempts to explore loss mitigation options and leading to further financial distress. *Id*. ¶ 30. She repeatedly provided Chase with Mr. Mena's death certificate and documentation showing she was named as a borrower. *Id*. ¶ 31. Despite her efforts, Chase refused to recognize her as either a borrower or successor-in-interest. *Id*.

Between 2016 and 2021, the servicing rights to the mortgage were transferred to Bayview Loan Servicing and then to CLS. *Id*. ¶ 32. Throughout this period, Ms. Urquizo continued her attempts to establish herself as a borrower and secure relief, but she eventually fell behind on her mortgage payments. *Id*. In April 2019, through legal counsel, Ms. Urquizo attempted to establish her status as a successor-in-interest. *Id*. ¶ 33. This process persisted until April 2022, when she applied to CLS to assume and modify the mortgage. *Id*.

3

Over the past few years, Ms. Urquizo made multiple unsuccessful attempts to simultaneously assume and modify her loan. Around late March or early April, 2022, she submitted a modification application to CLS. In response to Ms. Urquizo's June 14, 2022 QWR/NOE, Mr. Cooper stated that "[p]er prior servicer, Community Loan Servicing, LLC, the modification was denied April 22, 2022, due to the assumption documents were never returned. The borrower would need to reapply for a modification assumption with Mr. Cooper." *See* Declaration of Leslie Wybiral, Esq. ("Wybiral Decl.") dated September 16, 2024, Ex. F at 1. However, this lawsuit does not concern that modification application or CLS's April 22, 2022 denial. Instead, the denial prompted Ms. Urquizo to pursue another attempt.

**C. The Agreement**

On April 25, 2022, Ms. Urquizo submitted a completed modification application to CLS, seeking to simultaneously assume and modify her loan. *Id*. ¶ 33. Ms. Urquizo informed CLS that, as a successor-in-interest under Regulation X, she was entitled to simultaneously assume and modify the loan. Along with other documents, she submitted a Hardship Affidavit in which she stated, "Please note that I am seeking a simultaneous assumption and modification. I do not want to assume this loan if it is not also modified at the same time." (Wybiral Decl., Ex. B at 1 and 3).

On May 6, 2022, CLS approved her application and offered her the opportunity to assume and modify the loan simultaneously. *Id*. ¶ 34. The terms of CLS's offer included a new unpaid principal balance of $462,954.39, a 40-year re-amortization period, a fixed interest rate of 2.875%,[1] and an estimated monthly payment of $2,298.00. *Id*. ¶ 35. CLS's offer represented a

---

[1] Ms. Urquizo's 2.875% interest rate was a dream, as mortgage rates began to climb steadily shortly thereafter. According to the Fannie Mae Modification Interest Rate Exhibit, as of July 15, 2022 the interest rate had surged to 5.75%. By November 15, 2022, it had reached 7.00%, and thereafter hovered between 6.875%–7.000% until July 15, 2024. *See* https://singlefamily.fanniemae.com/media/8696/display.

significant breakthrough for Ms. Urquizo who had spent years trying to resolve the financial issues stemming from her husband's death. *Id.* ¶ 37.

CLS provided Ms. Urquizo with several documents to sign, which together made up the Agreement. These documents included a Loan Estimate, Equal Credit Opportunity Act Notice, New York Fair Credit Reporting Act Disclosure, Borrower's Certification and Authorization, FBI Mortgage Fraud Warning, Errors and Omissions/Compliance Agreement, Acknowledgment of Receipt of Loan Estimate, and Acknowledgment of Intent to Proceed. *Id.* ¶ 36. This Agreement is the central focus of this lawsuit, not Ms. Urquizo's earlier applications, as Defendants misleadingly suggest.

The "Loan Estimate" outlines the basic terms of CLS's offer. (Wybiral Decl., Ex. C at 3–5).

The "Acknowledgement of Receipt of Loan Estimate" states that "Signing this acknowledgement does not constitute an obligation on your part to proceed with the transaction *offered* in the Loan Estimate." (Emphasis added). (Wybiral Decl., Ex. C at 11).

The "Acknowledgement of Intent to Proceed" states "The undersigned applicants hereby indicate their intention to proceed with the transaction identified in the Loan Estimate dated May 6, 2022, provided by Community Loan Servicing, LLC." (Wybiral Decl., Ex. C at 12).

CLS also included a preprinted fax cover sheet instructing Ms. Urquizo to "Use this cover sheet when faxing documents back to your loan officer. Faxes that do not contain this cover sheet will not be processed or received by the intended recipient." (Wybiral Decl., Ex. C at 1).

On May 13, 2022, Ms. Urquizo accepted CLS's offer by signing the required documents and faxing the executed copies as instructed. *Id.* ¶ 39; (Wybiral Decl., Ex. C at 2).

5

**D. Servicing Transfers and Refusals to Honor the Agreement**

On May 16, 2022, CLS notified Ms. Urquizo that the servicing rights to her loan would be transferred to Mr. Cooper, effective June 1, 2022. *Id.* ¶ 40. However, CLS neglected to inform Mr. Cooper about the Agreement. *Id.* ¶ 41.

**1. The June 8, 2022 QWR/NOE**

On June 8, 2022, Ms. Urquizo sent a QWR/NOE to both CLS and Mr. Cooper, informing them of the Agreement offered by CLS and accepted by Ms. Urquizo. She provided proof of the Agreement and demanded that CLS "promptly transfer all documents related to its determination that Ms. Urquizo is a successor-in-interest, and that she has been approved to assume and modify the subject loan," and that Mr. Cooper "honor those decisions[.]" *Id.* ¶¶ 42–43; (Wybiral Decl., Ex. D).

On June 15, 2022, Mr. Cooper confirmed receipt of the QWR/NOE and assured Ms. Urquizo that a response would be provided no later than July 26, 2022. The first page of Mr. Cooper's letter states:

> Please note that Mr. Cooper is the servicer of the loan; and therefore, will be responsible for responding to any concerns regarding the servicing of the loan. Servicing matters include, but are not limited to, the following:
>
> - ***Payment assistance and modifications***
> - Payment posting
> - Validation of the debt
> - Foreclosure proceedings
> - Payment adjustments

*Id.* ¶ 44; (Wybiral Decl., Ex. E). CLS never responded to the QWR/NOE. *Id.* ¶ 45.

On July 7, 2022, Mr. Cooper responded to Ms. Urquizo's QWR/NOE in a letter. The letter stated, "[p]er prior servicer, Community Loan Servicing, LLC, the modification was denied April

22, 2022, due to the assumption documents were never returned.  The borrower would need to reapply for a modification assumption with Mr. Cooper." *Id*. ¶ 46; (Wybiral Decl., Ex. F).

**2.  The July 18, 2022 NOE**

On July 18, 2022, Ms. Urquizo sent a second NOE to Mr. Cooper, explaining that the April 22, 2022 denial pertained to a *prior* application and that she had submitted the operative assumption and modification application on April 25, 2022.  She mailed the July 18, 2022 NOE via USPS Priority mail, with a postage cost of $8.95. *Id*. ¶ 47; (Wybiral Decl., Ex. G).  The second NOE reiterated that CLS offered the Agreement on May 6, 2022–after the April 22 denial–and that she accepted the offer on May 13, 2022, rendering the earlier denial irrelevant to the current Agreement. *Id*. ¶ 48.

On July 27, 2022, Mr. Cooper acknowledged receipt of the second NOE and assured Ms. Urquizo that a response would be provided by September 2, 2022. *Id*. ¶ 49; (Wybiral Decl., Ex. H).  However, Mr. Cooper failed to respond to the second NOE and refused to honor the terms of the Agreement. *Id*. ¶ 50.

In December 2022, Ms. Urquizo received a notice from RCO Trust, dated November 28, 2022, stating that her mortgage loan had been transferred to RCO Trust as of November 18, 2022.  The notice described RCO Trust as a "private real estate investment company" that "does not service your loan," with FCI designated as the new servicer. *Id*. ¶ 51.  Around the same time, Ms. Urquizo received a separate notification from Mr. Cooper, dated November 23, 2022, informing her that the servicing rights to her loan would be transferred to Shellpoint, effective December 14, 2022. *Id*. ¶ 52.  These conflicting notices left Ms. Urquizo uncertain about who was servicing her mortgage or whom she should contact to resolve the servicing errors related to her Agreement with CLS. *Id*. ¶ 53.  In January 2023, she received a mortgage statement and a letter from Shellpoint,

dated January 4, 2023, stating that Shellpoint would transfer the servicing rights to FCI, effective January 20, 2023. *Id*. ¶ 54. CLS, Mr. Cooper, and FCI have all refused to recognize the Agreement's existence. *Id*. ¶ 57.

In February 2023, Ms. Urquizo received a letter dated February 13, 2023, from James Matthews at American Mortgage Investment Partners Management, LLC (AMIP), administrator of RCO Trust. *Id*. ¶ 58. AMIP offered Ms. Urquizo a new modification with significantly worse terms, including a principal balance of $504,000, a 40-year term at a 6% interest rate, and a monthly payment of $3,463.08—$1,165.08 higher than the original Agreement. *Id*. ¶ 60.

On March 21, 2023, AMIP sent a second offer for a loan assumption and modification. This offer was even less favorable, with a principal balance of $508,000 and a monthly payment of $3,485.09—$1,187.09 more than in the original Agreement. *Id*. ¶ 62. On March 22, 2023, through counsel, Ms. Urquizo informed Mr. Matthews of her existing Agreement with CLS, providing a copy of the executed Agreement and proof of its delivery to CLS. *Id*. ¶ 63. Mr. Matthews sought clarification from Alison Clark at FCI, but on March 27, Ms. Clark responded that their search of the loan file revealed no evidence that CLS had received the signed documents. *Id*. ¶¶ 64–65. Ms. Urquizo demanded that FCI honor the Agreement. *Id*. ¶ 66. However, in a letter dated April 20, 2023, FCI declined to do so, rejecting her claims and offering yet another modification with additional interest, a higher principal balance, and increased monthly payments. *Id*. ¶ 67.

### 3. The April 20, 2023 QWR/NOE

On April 20, 2023, Ms. Urquizo sent a third QWR/NOE to both CLS and Mr. Cooper, requesting documentation regarding her status as a successor-in-interest and evidence that the Agreement had been properly communicated to the successor servicers. The postage cost for

sending these QWRs/NOEs was $29.85. *Id*. ¶¶ 68–69; (Wybiral Decl., Ex. I). To date, CLS has not responded. *Id*. ¶ 70. On April 27, 2023, Mr. Cooper acknowledged receipt of the QWR/NOE and committed to providing a response by June 7, 2023. *Id*. ¶ 71; (Wybiral Decl., Ex. J).

### 4. The June 30, 2023 QWR/NOE

On June 30, 2023, Ms. Urquizo sent a fourth QWR/NOE to FCI, requesting all documents related to her status as a successor-in-interest and any communications between servicers regarding the Agreement. The cost to mail this QWR/NOE was $9.95. *Id*. ¶¶ 74–75; (Wybiral Decl., Ex. K). FCI acknowledged receipt of the QWR/NOE on July 6, 2023. *Id*. ¶ 76; (Wybiral Decl., Ex. L). On July 12, 2023, FCI responded further, stating that an extensive search of the loan file revealed no evidence that CLS received the pre-closing documents from May 13, 2022, and confirmed there was no "in-flight loss mitigation" that FCI was required to honor. *Id*. ¶ 77; (Wybiral Decl., Ex. M).

On November 3, 2023, Clark Hill, an FCI Loan Resolution Specialist, emailed a fourth proposed modification from AMIP. This proposal included a new principal balance of $516,000, a 40 year re-amortization period at a fixed interest rate of 8%, and a monthly payment of $3,587.81. *Id*. ¶ 78. Like previous offers, this modification added interest arrears and significantly increased the monthly payment. *Id*. ¶ 79. On November 22, 2023, Ms. Urquizo, through her counsel, rejected the proposal. *Id*. ¶ 80.

Ms. Urquizo has experienced overwhelming stress, which has only been intensified by Defendants' continued failure to resolve the matter. *Id*. ¶ 81. She faces the constant fear of losing her home, where she has lived for the past twenty years with her two daughters, ages 15 and 19. The threat of foreclosure hangs over her daily, disrupting her sense of security. This ongoing uncertainty has resulted in sleepless nights and heightened anxiety, as she grapples with the

emotional toll of potentially losing the home she has worked hard to maintain for her family. *Id*. ¶ 82.

## E.  The Foreclosure Action

After Ms. Urquizo commenced this action on February 6, 2024, on March 25, 2024, FCI filed a foreclosure action against Ms. Urquizo in the Supreme Court of the State of New York, Queens County.  *Id*. ¶ 83; (Wybiral Decl., Ex. O").  The case, titled *Wilmington Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust VIII-A v. Sofia Urquizo, Individually and as Executor of the Estate of Miguel A. Mena a/k/a Miguel Mena, et al.*, Index Number 706385/2024 (the "Foreclosure Action"), demanded the full remaining balance of the loan, further increasing the amount allegedly owed.  *Id*. ¶ 84.  The foreclosure became public, and on March 29, 2024, Ms. Urquizo received a call from a real estate speculator, who suggested she sell her home before losing it.  *Id*. ¶ 86.  This was the first time she became aware of the Foreclosure Action, as she had not yet been served.  *Id*.  Since then, she has been inundated with calls and solicitations from individuals looking to profit from her distress.  *Id*. ¶ 87.  This relentless contact has intensified her stress and anxiety, all stemming from FCI's foreclosure filing.  If the Foreclosure Action not been filed, she would have been spared this added emotional burden.  *Id*. ¶ 88.

## I.  Standard of Review – Fed. R. Civ. P. 12(b)(6)

On a motion to dismiss, the question is "'not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to present evidence to support the claims.'"  *Diaz v. Residential Credit Sols., Inc*., 965 F. Supp. 2d 249, 254 (E.D.N.Y. 2013) (quoting *Todd v. Exxon Corp*., 275 F.3d 191, 198 (2d Cir. 2001)).  In evaluating a motion under Rule 12(b)(6), the court's role is to assess the legal sufficiency of the complaint, not to weigh the evidence that might be presented in

support of it. *DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (citation omitted). The court must accept all well-pleaded factual allegations as true and determine whether they plausibly suggest an entitlement to relief. *Fezzani v. Bear, Stearns & Co., Inc.*, 716 F.3d 18, 22 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In deciding a Rule 12(b)(6) motion, the court is limited to the contents of the complaint, meaning it may only consider facts stated in the complaint, documents attached or incorporated by reference, and matters subject to judicial notice. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

In light of the allegations presented within the four corners of her Complaint, Ms. Urquizo has adequately stated claims for all causes of action against Defendants. The facts, as alleged, are sufficient to support each of her claims, justifying further judicial consideration. For these reasons, this Court should deny Defendants' Motions to dismiss in their entirety, allowing the case to proceed on the merits.

## II. ARGUMENT

### A. *Colorado River* Abstention Is Not Applicable

Defendants argue that this Court should abstain from exercising jurisdiction over Ms. Urquizo's claims based on the doctrine of abstention. However, a district court may only abstain in cases that fall within the "narrow and specific limits" of the abstention doctrine. *In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849, 2006 WL 3193709, at *2 (E.D.N.Y. 2006). Abstention is the exception, not the rule, as federal courts have a duty to adjudicate cases properly before them. *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813 (1976). Federal courts have a "virtually unflagging" obligation to exercise jurisdiction, and the presumption is in

11

favor of retaining jurisdiction. *McCrobie v. Palisades Acquisition XVI, LLC*, 359 F. Supp. 3d 239, 249 (W.D.N.Y. 2019) (quoting *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012). In motions to dismiss based on abstention, the burden of persuasion rests on the party opposing federal jurisdiction. *Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York*, 762 F.2d 205, 210 (2d Cir. 1985).

This case does not justify abstention, and this Court should exercise its "virtually unflagging" duty to retain jurisdiction.

Defendants wrongly assert the need for abstention under the *Colorado River* doctrine, citing to the Foreclosure Action, which was initiated only *after* this federal case was filed. They erroneously assert that both cases involve the same parties and issues, including the enforceability of the mortgage and Ms. Urquizo's alleged default, and argue that the state court is better positioned to address these matters. They further contend that abstention would avoid duplicative litigation, inconsistent rulings, and piecemeal adjudication. However, abstention is not justified because the later-commenced Foreclosure Action is *not* parallel to this federal case, and, even if it were, the six *Colorado River* factors weigh in favor of this Court retaining jurisdiction.

## 1. The Foreclosure Action is Not Parallel to the Federal Case

As a threshold matter, abstention under the *Colorado River* doctrine applies only if the cases are "parallel." Cases are considered "parallel" when "substantially the same parties are contemporaneously litigating substantially the same issue in another forum." *Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998) (quoting *Day v. Union Mines Inc.*, 862 F.2d 652, 655 (7th Cir. 1988); *see Shields v. Murdoch*, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) ("Federal and state proceedings are concurrent or parallel for purposes of abstention when the two proceedings are essentially the same; that is, there is an identity of parties, and the issues and relief sought are

the same.") (citation and internal quotation marks omitted).  Proceedings are not substantially the same when they involve different subject matters, different forms of relief, and the outcome of one has no impact on the other.  *Sheerbonnet, Ltd. v. Am. Express Bank Ltd.*, 17 F.3d 46, 50 (2d Cir. 1994).  "Accordingly, the appropriate inquiry is whether the two cases are sufficiently similar that the state court action will be adequate to completely and promptly resolve the issues between the parties."  *Walker v. PHH Mortg. Corp.*, No. 22-cv-23276, 2023 WL 1778514, at * 3 (S.D. Fla. Feb. 6, 2023) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 ("If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant . . . dismissal at all.")).

### a.  There Is No Identity of Parties Between the Foreclosure Action and the Federal Case

There is no identity of parties between the Foreclosure Action and this case.  In this case, Ms. Urquizo has sued three mortgage servicers–CLS, Mr. Cooper and FCI–none of whom are involved in the Foreclosure Action.  Wilmington Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust VIII-A ("Wilmington"), the plaintiff in the Foreclosure Action, is not a party in this case.  The Foreclosure Action is solely about enforcing a mortgage debt by the holder of the mortgage, unrelated to whether the mortgage servicers complied with RESPA and Regulation X.  It offers no remedy for RESPA violations by servicers who are not part of the Foreclosure Action.  "Though abstention does not require that the parties in the relevant suits be identical, when dismissal of the federal proceeding would leave a defendant free from any proceeding on issues in question, abstention is unwarranted."  *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 664 (S.D.N.Y. 2016) (quoting *DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 645 (S.D.N.Y. 2011).

13

Courts have repeatedly held that cases are not parallel when the parties are different, even if they are connected to the same underlying transaction. For instance, in *Yeboah v. Bank of America, N.A.*, No. 3:18-cv-2020, 2019 WL 3388045, at *8 (D. Conn. July 26, 2019), the court found that a federal action involving claims against a mortgage servicer was not parallel to a state foreclosure action, as the servicer was not a party to the state case.  Similarly, in *Cortes-Goolcharran v. Rosicki, Rosicki & Assocs. PC*, No. 17-CV-3976, 2018 WL 3748154, at *4 (E.D.N.Y. Aug. 7, 2018) the court concluded that the federal action and state quiet title action were not parallel because the servicer and foreclosure law firm in the federal case were not parties to the state action.

None of the Defendants in this case are parties to the Foreclosure Action, meaning the claims raised by Ms. Urquizo here cannot and will not be resolved in the state court litigation.  In fact, there is nothing in the record of the Foreclosure Action to support Defendants' claim that the same parties are currently litigating the same issues in another forum.

CLS argues, without citing legal authority, that the parties in both cases should be considered substantially the same because Ms. Urquizo's claims are allegedly against the Defendants as agents of the mortgagee.  CLS unreasonably argues that because Defendants serviced the mortgage on behalf of the mortgagee, the distinction between the Foreclosure Action and the claims in this case is irrelevant.  However, this argument overlooks that the Foreclosure Action addresses Ms. Urquizo's alleged default under the original Note and Mortgage, while the current case involves different issues—namely, Defendants' violations of RESPA and Regulation X, as well as their breach of the Agreement.  CLS's reasoning fails to recognize the significant differences in the claims and the legal arguments at issue in the two cases.  The Foreclosure Action

14

concerns the original mortgage, whereas this case involves loan servicing violations and the breach of an entirely separate contract.

Mr. Cooper neglects to address the issue of party identity, instead relying solely on *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 862 F. Supp. 2d 170, 182 (E.D.N.Y. 2012). In that case, the court stated that "[c]omplete identity of parties and claims is not required; the parallel litigation requirement is satisfied when the main issue in the case is the subject of already pending litigation."[2]

In *First Keystone*, the court granted the defendant's motion to dismiss under the *Colorado River* abstention doctrine. The court noted that all remaining parties in the federal action were also parties to the state court action, with the state case including an additional party absent from the federal case, which favored abstention. Both cases involved the same parties, issues, and disputes over funds from the same construction projects. Given the significant overlap between the cases and the advanced stage of the state court action–where an injunction had been issued and a comprehensive accounting of the disputed funds was underway–the court found abstention appropriate to avoid piecemeal litigation and duplicative efforts. Additionally, the court observed that the plaintiffs had already participated in lengthy state court litigation before filing the federal action, viewing the federal case as reactive. As a result, the court determined that dismissal, rather than a stay, was proper because the state court could fully resolve the plaintiffs' claims. In contrast, in this case, it is the Foreclosure Action that is "reactive," as it was filed after this federal case.

FCI argues that it should be considered substantially the same party as Wilmington for *Colorado River* purposes, simply because both Wilmington, as the entity entitled to enforce the loan, and FCI share a common interest in determining the enforceability of the Agreement. To

---

[2] The Foreclosure Action, of course, was not already pending when this case was filed. The Foreclosure Action was commenced *after* this case was filed.

support this claim, FCI relies on *Sitgraves v. Fed. Home Loan Mortg. Corp.*, 265 F. Supp. 3d 411 (S.D.N.Y. 2017) and *Potente v. Cap. One, N.A.*, No. 16-CV-3570, 2018 WL 1882848 (E.D.N.Y. Apr. 19, 2018).  However, both cases are easily distinguishable.

In *Sitgraves*, the mortgagor, Mary Sitgraves, filed an action against Bank of America, N.A. (BANA) and the Federal Home Loan Mortgage Corp. (Freddie Mac), challenging the enforceability of the note and mortgage.  Years earlier, BANA had initiated a foreclosure action in state court.  BANA and Freddie Mac requested abstention under the *Colorado River* doctrine, and the court found the federal and state actions to be parallel, both involving the same issues of enforceability.  However, the court did not explain in detail why BANA and Freddie Mac were considered substantially the same parties.

Similarly, in *Potente*, the plaintiffs brought an action against Capital One, N.A., Greenpoint Mortgage Funding, Inc. and North Fork Bancorporation challenging the validity of the mortgage and alleging TILA violations.  Capital One had filed a foreclosure action years earlier in state court.  The court found the actions parallel, involving the same parties and issues, noting that Greenpoint and North Fork's shared interest with Capital One, due to corporate acquisitions, justified treating them as substantially the same party.  *Potente* is distinguishable because Wilmington is the entity entitled to enforce the mortgage, while FCI's role is limited to servicing Ms. Urquizo's loan.  Wilmington initiated the Foreclosure Action only after Ms. Urquizo filed this federal case, further weakening FCI's argument that the parties are substantially the same.

### b. The Issues in the Foreclosure Action and in the Federal Case Are Not Substantially Similar

The second requirement for establishing that cases are parallel under the *Colorado River* doctrine is that the issues being litigated in both forums must be substantially identical. Specifically, there must be "'a substantial likelihood that the state litigation will dispose of *all*

16

claims presented in the federal case.'"  *Bongiovanni v. PennyMac Corp*., No. 19-CV-3260, 2021 WL 1193043, at *4 (E.D.N.Y. 2021) (emphasis in original) (citation omitted); *In re Comverse Tech., Inc. Derivative Litig.,* 2006 WL 3193709, at *2 (same).

Courts in this district have consistently ruled that federal cases involving claims under statutes like RESPA or the Fair Debt Collection Practices Act (FDCPA) are not parallel to state foreclosure actions because they involve distinct legal issues.  For example, in *Bongiovanni*, this court refused to abstain under the *Colorado River* doctrine because the plaintiff's FDCPA and RESPA claims could "find no analogue in the state [foreclosure] action."  2021 WL 1193043, at *4.  Similarly, in *McCrobie*, the court refused to abstain, observing that FDCPA claims concerning debt collection practices were distinct from state actions addressing the validity of the debt itself, meaning that the federal case could proceed separately from the state action.  359 F. Supp. 3d at 249.  *See also Page v. Forster & Garbus, LLP*, No. 18-CV-3611, 2019 WL 5696108, at * 3 (E.D.N.Y. June 17, 2019) (citing *McCrobie*); *Winslow v. Forster & Garbus, LLP*, No. CV 15-2996, 2017 WL 6375744, at *14 (E.D.N.Y. Dec. 13, 2017).

Ms. Urquizo's RESPA claims have no counterpart in the Foreclosure Action.  While the Foreclosure Action focuses on enforcing the Note and Mortgage, her federal claims center on Defendants' servicing violations, including their failure to recognize the Agreement.  These RESPA claims involve specific legal duties imposed by federal law, separate from the mortgage default being litigated in the Foreclosure Action.  Therefore, the Foreclosure Action cannot resolve the distinct federal issues.

All three Defendants seem to deliberately blur the distinction between the issues in this case and those in the Foreclosure Action.  In the Foreclosure Action, the central issue is Ms. Urquizo's alleged default under the terms of the Note and Mortgage, which are the contracts being

17

enforced there.  In contrast, this case involves Defendants' failure to honor the Agreement, as federal law required them to do.  Furthermore, Ms. Urquizo's RESPA claims arise from servicing violations related to the Agreement, not from the original Note and Mortgage at issue in the Foreclosure Action.  Defendants' attempt to conflate these distinct issues misrepresents the true nature of the claims in this federal action.

Even if the Foreclosure Action results in an unfavorable outcome for Ms. Urquizo, it would not moot or resolve her federal claims regarding mortgage servicing violations.  A favorable ruling in the Foreclosure Action might restore her property rights but would not address the RESPA and Regulation X violations related to Defendants' failure to honor the Agreement.  Ms. Urquizo's claims in this case would remain unaffected by any state court judgment.

Additionally, the relief available and the parties impacted differ between the two cases.  If the state court finds that Wilmington failed to establish the elements of foreclosure, it may bar the foreclosure remedy for Wilmington.  However, a favorable ruling for Ms. Urquizo in this case would address the Defendants' violations of RESPA and Regulation X, awarding only damages flowing from those violations.

Federal jurisdiction is not precluded simply because the two actions share some issues.  As the Supreme Court emphasized in *Colorado River*, "the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction."  424 U.S. at 816.  The court in *Suffolk Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 829 F. Supp. 2d 82, 87 (E.D.N.Y. 2010) echoed this principle, noting that although there may be a risk of inconsistent outcomes, such a risk does not "'outweigh the heavy presumption against abstention." (quoting *In re Asbestos Litig.*, 963 F. Supp. 247, 253 (S.D.N.Y. 1997)).

Because the relief sought in this case is unavailable in the Foreclosure Action, the two cases are not functionally equivalent, further highlighting why they are not parallel under *Colorado River*.

### 2. Even if the Cases Were Parallel, Abstention is Inappropriate Because the *Colorado River* Factors Weigh in Favor of This Court Retaining Jurisdiction

Even if this Court finds the cases to be parallel, abstention under *Colorado River* would still be improper because the relevant factors weigh in favor of retaining jurisdiction. In determining whether abstention is appropriate, courts consider six factors:

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Woodford v. Cmty. Action Agency of Greene Cnty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001). "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required. *Only the clearest of justifications will warrant dismissal.*" *Moses Cone.*, 460 U.S. at 15–16 (quoting *Colorado River*, 424 U.S. at 818–19) (emphasis in *Moses Cone*). "In this analysis, 'the balance [is] heavily weighted in favor of the exercise of jurisdiction.'" *Woodford*, 239 F.3d at 522 (quoting *Moses Cone*, 460 U.S. at 16). "[T]he facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Id.*

Here, all six factors clearly support retaining jurisdiction.

### a. Factor One – Whether the Controversy Involves a Res

The first factor considers whether a court has assumed jurisdiction over specific property (the "res"), which is common in foreclosure cases where the state court controls the property.

While the Foreclosure Action involves such jurisdiction, this case, which seeks monetary damages for Defendants' RESPA violations, does not involve jurisdiction over any specific property. The federal claims under RESPA focus on Defendants' conduct in managing Ms. Urquizo's loan, not on determining property rights. Therefore, this factor does not support abstention.

### b. Factor Two – Convenience of the Federal Forum

Regarding the second factor, the federal forum is as geographically convenient for the parties as the state forum, especially since many courts are conducting remote proceedings. Thus, both forums are equally convenient, and when the federal court is no less convenient than the state court, this factor favors retaining jurisdiction. *Vill. of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999).

### c. Factor Three – Risk of Piecemeal Litigation

The third factor considers the risk of piecemeal litigation, which can occur when different courts handle related issues, potentially leading to conflicting rulings. In this case, however, that risk is minimal. The Foreclosure Action deals with mortgage enforcement, while the federal case addresses Defendants' compliance with federal mortgage servicing obligations. Since the legal issues in each case are distinct, the outcome of one will not directly impact the other. As the Supreme Court noted in *Colorado River*, "the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction" 424 U.S. at 816. Thus, this factor also weighs against abstention.

### d. Factor Four – Order of Filing

The fourth factor supports retaining jurisdiction, as this case was filed *before* the Foreclosure Action, and both are still in their early stages. In this case, pre-answer motions to dismiss have been filed, while in the Foreclosure Action, Ms. Urquizo has filed an answer.

Importantly, this case has progressed further, with an initial conference held in May 2024, whereas no appearances are yet scheduled in the Foreclosure Action. The Foreclosure Action is also delayed by the requirement to exhaust the mandatory settlement conference process under CPLR § 3408 before proceeding. Courts do not base abstention solely on which case was filed first but consider the progress made in each forum. *Arkwright-Boston Mfrs. Mut. Ins. Co.*, 762 F.2d at 211; *see Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 328 (2d Cir. 1986) ("With regard to the chronological order in which the courts obtained jurisdiction . . . 'priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.'") (quoting *Moses Cone*, 460 U.S. at 21). This factor weights in favor of retaining jurisdiction.

### e. Factor Five – Rule of Decision

The fifth factor is especially important in this case and strongly opposes abstention. Ms. Urquizo's RESPA claims are based on a federal statute, with federal law governing the rights and obligations at issue. Federal courts are best suited to interpret and enforce federal statutes. The Second Circuit has emphasized that when federal law provides the rule of decision, this factor strongly supports retaining jurisdiction. *Woodford*, 239 F.3d at 523. Moreover, federal courts regularly exercise supplemental jurisdiction over related state law claims that arise from the same case or controversy under 28 U.S.C. § 1367. This further justifies retaining federal jurisdiction, as it allows both the federal and state claims to be resolved in one proceeding, ensuring consistency and avoiding duplicative litigation.

### f. Factor Six – Protection of Plaintiff's Federal Rights

The sixth and final factor considers whether the state court can adequately protect Ms. Urquizo's federal rights. As the Supreme Court noted in *Moses Cone*, "[i]f there is any substantial

doubt as to this, it would be a serious abuse of discretion to grant the . . . dismissal at all." 460 U.S. at 28. In this case, the Foreclosure Action cannot address Ms. Urquizo's RESPA claims, as the Defendants are not parties and there are no relevant facts in the record to support her federal claims. While an inadequate state forum would strongly support exercising federal jurisdiction, the adequacy of the state forum does not heavily favor dismissal under *Colorado River*. *Dalzell Mgmt. Co., Inc. v. Bardonia Plaza, LLC*, 923 F. Supp. 2d 590, 602 (S.D.N.Y. 2013) (citation omitted); *see also Dunkin' Donuts Franchised Rests. LLC v. Rijay, Inc*., No. 06 CIV 8237, 2007 WL 1459289, at *6 (S.D.N.Y. May 16, 2007) ("The fact that the state court is competent to adjudicate plaintiff's claims is largely irrelevant."). Consequently, this factor weighs against abstention.

In sum, the *Colorado River* factors strongly oppose abstention. The federal case addresses distinct issues under RESPA that the Foreclosure Action cannot resolve. Both forums are equally convenient, the risk of piecemeal litigation is low, and the federal court is best suited to handle the federal statutory claims. Given the strong presumption in favor of federal jurisdiction, as emphasized by the Supreme Court in *Moses Cone*, this Court should retain jurisdiction.

**B. Ms. Urquizo Has Adequately Alleged Violations of RESPA Upon Which Relief Can Be Granted**

Defendants' assertion that Ms. Urquizo has not alleged cognizable violations of RESPA is incorrect. She has clearly and sufficiently pled multiple violations, including Defendants' failure to (i) provide accurate and timely responses to her QWRs; (ii) properly investigate and resolve the errors she identified in her NOEs; and (iii) appropriately manage her loss mitigation documents. These violations are the foundation of her claims, and Defendants' arguments to the contrary are without merit.

1. **RESPA and Regulation X**

In response to the global financial crisis, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") to "protect consumers from abusive financial services practices[.]"  Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376.  The law directed the Consumer Financial Protection Bureau (CFPB) to implement regulations for federal consumer financial laws and amended RESPA to address specific errors made by servicers of federally related mortgages.  12 U.S.C. § 2605(k)(1)(C).  These errors include improper payment allocation, inaccurate final payoff balances, failures in foreclosure prevention, and other common servicer responsibilities.  *Id.*  In response, the CFPB established a regulatory framework under Regulation X, which includes a formal process for borrowers to submit a "notice of error" to their mortgage servicers.  12 C.F.R. § 1024.35.

RESPA, a consumer protection statute, promotes transparency and protects consumers during the mortgage settlement process.  *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (citation omitted).  Under Regulation X, borrowers can use the notice of error process to seek corrections directly from servicers.  *Berene v. Nationstar Mortg., LLC*, 800 F. App'x 756, 760 (11th Cir. 2020) (citing 12 C.F.R. § 1024.35(a)).  A servicer's failure to provide responsive, consistent, or accurate answers may indicate a lack of a reasonable investigation, as recognized in multiple cases including *Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 F. App'x 905, 909-910 (11th Cir. 2016) (reversing dismissal of RESPA claim where servicer's responses to notice of error contradicted the history of the loan, failed to acknowledge its error, and were "unreasonable assessments of the situation"); *Hernandez v. J.P. Morgan Chase Bank, N.A.*, No. 14-24265-CIV, 2016 WL 3982496 (S.D. Fla. July 22, 2016) (denying summary judgment to servicer where borrower presented evidence contradicting the factual assertions in the servicer's response to his

notice of error); *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 804–05 (E.D. Pa. 2014) (finding plausible claim for failure to conduct a reasonable investigation where the servicer's responses gave contradictory explanations); *Harris v. Nationstar Mortg. LLC*, No. CCB-19-3251, 2020 WL 4698062, at *8 (D. Md. Aug. 13, 2020) (finding that plaintiff adequately pled violations of RESPA and Regulation X based on lender's lack of a reasonable investigation, and failure to substantively respond to her QWR/NOE).

Under RESPA, mortgage servicers can be held liable for damages if they fail to correct identified errors or do not conduct a reasonable investigation and provide a written response to the borrower.  12 U.S.C. § 2605(f).

### 2. The CFPB Expressly States that "Servicing" Includes Loss Mitigation

RESPA governs the "Servicing of mortgage loans."  12 U.S.C. § 2605.  The servicing of mortgage loans clearly includes issues related to loss mitigation.  Defendants' arguments to the contrary ignore the comprehensive regulatory framework designed to protect borrowers from servicing misconduct.

In October 2016, the CFPB published Amendments to the 2013 Mortgage Rules Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z), 81 Fed. Reg. 72160-01 (Oct. 19, 2016).  In discussing § 1024.41 (Loss mitigation procedures), the Bureau noted its decision not to preserve a borrower's appeal rights under § 1024.41(h) for challenging a servicer's failure to evaluate a complete loss mitigation application submitted at least 90 days before a foreclosure sale.  The Bureau emphasized, "even absent appeal rights under § 1024.41(h), *borrowers may [] submit a notice of error under § 1024.35 relating to the loss mitigation or foreclosure process and to the servicing of the loan, and servicers must comply with*

*the applicable provisions of § 1024.35 regarding such notices of error.*"  81 Fed. Reg. at 72281 (emphasis added).

Regulation X provides the legal framework for borrower to submit notices to their servicer of a covered error related to the servicing of their mortgage, and the servicers' duties in responding. *See* 12 C.F.R. § 1024.35.  Regulation X defines the type of errors subject to the regulation referred to as "covered errors."  12 C.F.R. § 1024.35(b).  Three of the ten "covered errors" directly relate to loss mitigation.  *See* 12 C.F.R. §§ 1024.35(b)(7), (9)-(10):

> (b) Scope of error resolution.  For purposes of this section, the term "error" refers to the following categories of covered errors:
>
> * * *
>
> (7) Failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by § 1024.39.
>
> * * *
>
> (9) Making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process in violation of § 1024.41(g) or (j).
>
> (10) Moving for foreclosure judgment or order of sale, or conducting a foreclosure sale in violation of § 1024.41(g) or (j).

In February 2013, the CFPB introduced 12 C.F.R. § 1024.35(b)(11), the catch-all provision, which encompasses "[a]ny other error relating to the servicing of a borrower's mortgage loan," because it "believes that it is necessary and appropriate to achieve the purposes of RESPA to craft error resolution procedures that are sufficiently flexible to adapt to changes in the mortgage market and to encompass the myriad and diverse types of errors that borrowers may encounter with respect to their mortgage loans."  Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696-01, 10744 (Feb. 14, 2013).

The CFPB proposed a rule in July 2024 to amend the mortgage servicing rules under Regulation X.  Specifically, the agency proposes to amend Regulation X "to clarify that inaccurate

25

loss mitigation determinations are a covered error under the existing error resolution provisions in § 1024.35." Streamlining Mortgage Servicing for Borrowers Experiencing Payment Difficulties; Regulation X, 89 Fed. Reg. 60204-01, 60219 (July 24, 2024). The CFPB acknowledged its awareness of the "confusion about whether the 'catch-all' category in the error resolution procedures in § 1024.35(b)(11) includes loss mitigation determinations." *Id*. The Bureau explained that "[a]lthough the CFPB did not explicitly specify loss mitigation determinations as a covered error category in the 2013 Mortgage Servicing Final Rule, it has always intended for the catch-all to cover a broad range of errors–including errors related to loss mitigation determinations." *Id*.

Courts have found that failures related to implementing a permanent loan modification and other loss mitigation errors can full under RESPA. *See, e.g., Nunez*, 648 F. App'x at 908 (reversing and remanding dismissal of RESPA claim based on an error asserting that the servicer failed to implement "the terms of the loan modification agreement"); *Yepez v. Specialized Loan Servicing, LLC*, No. 18 C 7422, 2019 WL 2644255, at *3 (N.D. Ill. June 27, 2019) (refusing to dismiss RESPA claim based on servicer's refusal to assist plaintiffs in their efforts to obtain a loss mitigation by failing to acknowledge and respond to their notices of error.); *McClain v. CitiMortgage, Inc.*, No. 15 C 6944, 2016 WL 269568, at *5 (N.D. Ill. Jan. 21, 2016) (QWRs sent by plaintiff to Citi asking whether her loan modification was in place "concerned servicing, because the question of whether a modification was in place impacted on (indeed it determined) how [plaintiff's] payments were being applied and whether Citi was assessing default-related fees.").

Defendants mistakenly rely on *Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254 (S.D.N.Y. 2017) to argue that loss mitigation issues are not "covered errors" under RESPA and Regulation

X.    However, the court in *Sutton* based its decision on the CFPB's 2014 guidance and did not consider the CFPB's 2016 guidance, which clarified that borrowers can submit notices of error related to loss mitigation and foreclosure.  *See id*. *at 272-273.*  *Sutton* is both factually and legally distinguishable from the present case.   In *Sutton*, the plaintiff's primary complaint was her dissatisfaction with the loan modification terms, specifically a balloon payment, which she knowingly accepted.   The court determined that her claim was an attempt to renegotiate the modification, not an allegation of an error in loan servicing.   As such, the court ruled that disputes over modification terms do not fall under RESPA's definition of "servicing," which relates to loan administration, not its creation or modification.   Because *Sutton* was decided without the benefit of the CFPB's 2016 guidance, its holding should be limited to cases where a servicer denies or approves a loss mitigation application, and not extended to cases where a servicer fails to implement a modification after a borrower has executed the final paperwork.

Unlike *Sutton*, Ms. Urquizo's case centers on the failure to properly service her loan and the mishandling of loss mitigation inquiries under the loan's existing terms.  After her husband's death, Ms. Urquizo made multiple attempts to assume and modify the loan.  Although  CLS ultimately approved her application for a simultaneous assumption and modification, it failed to notify the successor servicer, Mr. Cooper, of this approval.   This violated 12 C.F.R. § 1024.41(k)(5), which requires servicers honor pending loss mitigation offers during a servicing transfer.[3]

---

[3] 12 C.F.R. § 1024.41(k)(5) states:

(k) Servicing transfers—

* * *

(5) Pending loss mitigation offers. A transfer does not affect a borrower's ability to accept or reject a loss mitigation option offered under paragraph (c) or (h) of this section. If a transferee servicer acquires the servicing of a mortgage loan for which the borrower's time period under paragraph (e) or (h) of this section for accepting or rejecting a loss mitigation option offered by the transferor servicer has not expired as of the transfer date, the

Ms. Urquizo submitted multiple QWRs and NOEs to Defendants, providing a copy of the Agreement and demanding its enforcement. However, CLS and Mr. Cooper either failed to respond or provided inadequate responses, violating RESPA's requirements under 12 C.F.R. § 1024.35(d) and (e), which mandate timely and substantive replies to QWRs and NOEs.[4] Additionally, under 12 C.F.R. § 1024.38(b)(4), servicers are required to transfer all relevant information to subsequent servicers.[5] CLS failed to transfer Ms. Urquizo's Agreement documents

---

transferee servicer must allow the borrower to accept or reject the offer during the unexpired balance of the applicable time period.

[4] **§ 1024.35 Error resolution procedures.**

(a) Notice of error. A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred. A notice on a payment coupon or other payment form supplied by the servicer need not be treated by the servicer as a notice of error. A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request.

\* \* \*

(d) Acknowledgment of receipt. Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving a notice of error from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the notice of error.

(e) Response to notice of error—

    (1) Investigation and response requirements—

        (i) In general. Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:

            (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

            (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

[5] **§ 1024.38 General servicing policies, procedures, and requirements.**

    (a) Reasonable policies and procedures. A servicer shall maintain policies and procedures that are reasonably designed to achieve the objectives set forth in paragraph (b) of this section.

    (b) Objectives—

\* \* \*

to Mr. Cooper, who then failed to pass them on to Shellpoint and eventually FCI. As successor servicers, Mr. Cooper and FCI also failed to identify and obtain the missing documents that were not transferred by the prior servicer.

Defendants give only a superficial nod to *Naimoli v. Ocwen Loan Servicing, LLC*, 22 F.4th 376 (2d Cir. 2022), likely because the case directly undermines their argument that loss mitigation is not a covered error under RESPA and Regulation X. In *Naimoli*, the Second Circuit explicitly held that errors related to mishandling a loan modification, such as failing to record documents and properly manage the loan, qualify as "covered errors" under the catch-all provision of § 1024.35(b)(11). The court emphasized that broad language of the regulation–specifically, "any other error relating to the servicing of a borrower's mortgage loan"–is expansive enough to include errors involving loan modifications. By merely citing *Naimoli* without addressing its relevance, Defendants attempt to gloss over the cases' clear contradiction to their position, neglecting to engage with its substantive reasoning, which supports Ms. Urquizo's claims.

In light of *Naimoli* and its clear recognition that errors related to loan modifications fall within RESPA's scope, Defendants' argument that loss mitigation errors are not covered under Regulation X is without merit. Their failure to meaningfully engage with the Second Circuit's reasoning in *Naimoli* underscores the weakness of their position. The court's broad interpretation

---

(4) Facilitating transfer of information during servicing transfers. The policies and procedures required by paragraph (a) of this section shall be reasonably designed to ensure that the servicer can:

(i) As a transferor servicer, timely transfer all information and documents in the possession or control of the servicer relating to a transferred mortgage loan to a transferee servicer in a form and manner that ensures the accuracy of the information and documents transferred and that enables a transferee servicer to comply with the terms of the transferee servicer's obligations to the owner or assignee of the mortgage loan and applicable law; and

(ii) As a transferee servicer, identify necessary documents or information that may not have been transferred by a transferor servicer and obtain such documents from the transferor servicer.

of § 1024.35(b)(11) supports Ms. Urquizo's claims, confirming that the mishandling of her loan modification is indeed a covered error under RESPA. Therefore, Defendants' attempts to sidestep this authority should be rejected, and Ms. Urquizo's claims should be allowed to proceed.

### 3. Defendants Failed to Adequately Respond to Ms. Urquizo's QWRs/NOEs

Defendants failed to properly respond to Ms. Urquizo's QWRs and NOEs, violating their obligations under RESPA and Regulation X. Despite receiving multiple QWRs and NOEs from Ms. Urquizo regarding key issues with her loan modification, Defendants either provided incomplete or inaccurate responses, or failed to respond at all. These failures breached their duty to conduct reasonable investigations and provide correct information, causing Ms. Urquizo significant harm, including financial losses and emotional distress. Below are the specific instances in which Defendants failed to fulfill their obligations.

### a. June 8, 2022 – First QWR/NOE

On June 8, 2022, Ms. Urquizo sent a QWR/NOE to both CLS and Mr. Cooper, notifying them of the Agreement. She included a copy of the Agreement and requested that CLS transfer all related documents to Mr. Cooper. In her communication, Ms. Urquizo pointed out that under 12 C.F.R. § 1024.41(k)(5), *supra* n. 3, the transfer of mortgage servicing does not affect a borrower's ability to accept or reject a loss mitigation option if the offer was pending at the time of the transfer. While Mr. Cooper acknowledged receipt of the QWR/NOE on June 15, 2022, CLS failed to respond. Although CLS has already transferred servicing rights to Mr. Cooper, it was still under an obligation to response to QWRs and NOEs sent within a year after it transferred servicing rights. 12 C.F.R. § 1024.35(g)(1)(iii).[6] On July 7, 2022, Mr. Cooper issued an incorrect

---

[6] § 1024.35 Error resolution procedures.

                          * * *

(g) Requirements not applicable—

response, referencing a previous denial from April 22, 2022, which was unrelated to the Agreement. (FAC ¶¶ 40-46).

### b. July 18, 2022 – Second QWR/NOE

Ms. Urquizo sent a second QWR/NOE to Mr. Cooper, clarifying that her operative loan modification application was submitted on April 25, 2022, and accepted on May 13, 2022. She stressed that the earlier denial dated April 22, 2022, was irrelevant to the Agreement and requested that Mr. Cooper take appropriate action to honor the Agreement. Although Mr. Cooper acknowledged receipt of this QWR/NOE on July 27, 2022, it failed to provide any further response or take action to honor the Agreement, in direct violation of RESPA's requirements for timely and appropriate responses to borrower inquiries. 12 C.F.R. § 1024.35(e)(3)(C).[7] (FAC ¶¶ 47-50).

### c. April 20, 2023 – Third QWR/NOE
### June 30, 2023 – Fourth QWR/NOE

Ms. Urquizo sent a third QWR/NOE on April 20, 2023 to both CLS and Mr. Cooper, requesting documents related to her status as a successor-in-interest and confirmation that the Agreement had been properly transmitted to the successor servicers. CLS failed to acknowledge

---

(1) In general. A servicer is not required to comply with the requirements of paragraphs (d), (e), and (i) of this section if the servicer reasonably determines that any of the following apply:

* * *

(iii) Untimely notice of error. A notice of error is delivered to the servicer more than one year after:

    (A) Servicing for the mortgage loan that is the subject of the asserted error was transferred from the servicer receiving the notice of error to a transferee servicer; or

    (B) The mortgage loan is discharged.

[7] § 1024.35 Error resolution procedures.

* * *

(e) Response to notice of error–

* * *

    (3) Time limits–
    (i) In general. A servicer must comply with the requirements of paragraph (e)(1) of this section:

        * * *

        (C) For all other asserted errors, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer received the applicable notice of error.

or respond.  Mr. Cooper acknowledged receipt of the QWR on April 27, 2023 and responded on

May 23, 2023, stating:

> Out records indicated that on June 10, 2022, Mr. Cooper's records were updated to reflect Sofia Urquizo as the Successor in Interest ("SII").  Please be informed that Community's records indicate they could not successfully complete the modification and assumption process.  Please be advised that the loan account did not transfer to Mr. Cooper in an approved modification/assumption workout.  As such, the loan account was not approved for a workout while serviced by Mr. Cooper.  At this time, we are unable to re-evaluate the loan account or honor the previous servicer workout because the loan account was transferred from Mr. Cooper to Shellpoint Mortgage Servicing effective December 14, 2022.  We ask that you please get in touch will Shellpoint Mortgage Servicing, as all information concerning the loan account was transferred to them.

(Wybiral Decl., Ex. N).

Mr. Cooper's response directly contradicts its earlier reply to Ms. Urquizo's June 8, 2022

QWR/NOE where it stated:   "[p]er prior servicer, Community Loan Servicing, LLC, the

modification was denied April 22, 2022, due to the assumption documents were never returned.

The borrower would need to reapply for a modification assumption with Mr. Cooper."  CLS's

failure to "transfer accurate[] and timely information relating to the servicing of a borrower's

mortgage loan account to a transferee servicer" violates 12 C.F.R. § 1024.35(b)(8), a covered error.

Ms. Urquizo sent a fourth QWR/NOE to FCI on June 30, 2023, requesting all documents

related to her status as a successor-in-interest and any communications regarding the Agreement.

FCI acknowledged receipt of the request on July 6, 2023, and responded on July 12, 2023.  In its

response, FCI stated that it found no evidence of the Agreement in the loan file and claimed there

was no "in-flight loss mitigation" that needed to be honored.  (FAC ¶¶ 74-77).

Regulation X requires servicers to implement policies and procedures designed to ensure

the smooth and accurate transfer of information during mortgage servicing transfers.  12 C.F.R. §

1024.38(a), (b)(4)), *supra* note 5.  In October 2014, the CFPB issued a bulletin with the subject

"Mortgage Servicing Transfers" to provide guidance to residential mortgage servicers, highlighting the risks to consumers during such transfers.  79 Fed. Reg. 63295.  The bulletin advised that "[t]he revised Regulation X . . . took effect on January 10, 2014.  It requires servicers to, among other things, maintain policies and procedures that are reasonably designed to achieve the objectives of facilitating the transfer of information during mortgage servicing transfers and of properly evaluating loss mitigation applications," citing 12 C.F.R. § 1024.38(a), (b)(4).  The bulletin reported that CFPB examiners found that some servicers had failed to properly identify loans in trial or permanent modification at time of transfer.  In other cases, CFPB examiners found that servicers refused to honor trial or permanent modification offers unless they could independently confirm that the prior servicer properly offered a modification or that the offered modification met investor criteria.  Examinations further revealed that many transferee servicers did not obtain all necessary information from the transferor servicer, leading to delays, requiring borrowers to resubmit documents, or even resulting in new modifications with worse terms.  In some cases, foreclosures were conducted instead.  Based on these findings, the CFPB concluded that such practices were unfair and directed servicers them to adopt corrective measures, including providing relief to affected consumers.  The CFPB also determined that these actions may violate 12 C.F.R. § 1024.38 under the new servicing rule.  79 Fed. Reg. at 63297.

The circumstances outlined above serve as a clear roadmap for Ms. Urquizo's case.  Defendants failed to meet their obligations under Regulation X by not providing complete and accurate loan information during the transfer of her loan.  Despite Ms. Urquizo having an accepted loan modification and assumption agreement, CLS did not transfer the necessary documents and details to Mr. Cooper, the new servicer, which caused Mr. Cooper to wrongly deny the existence of the modification.  Mr. Cooper cryptically informed Ms. Urquizo that her loan account had not

transferred in an approved modification/assumption workout, and therefore, it was not approved for a workout while in their service.  This failure triggered a series of further servicing errors, as Mr. Cooper also did not pass on the correct information to Shellpoint or FCI, the subsequent servicers.  FCI then offered Ms. Urquizo progressively worse modification terms and eventually initiated the Foreclosure Action.  Similar to the consumers mentioned in the CFPB bulletin, Ms. Urquizo suffered confusion and mismanagement of her loan as a result of these failures.  These actions violated Regulation X's requirements for servicers to implement policies ensuring the smooth transfer of loan information, particularly in cases involving active loss mitigation agreements.  Consequently, Ms. Urquizo endured greater financial hardship and an increased risk of foreclosure, mirroring the same harm experienced by other consumers impacted by similar servicing failures.

In summary, the Defendants repeatedly violated their obligations under RESPA and Regulation X by providing incomplete, inaccurate, or delayed responses to Ms. Urquizo's QWRs/NOEs, and in doing so caused significant harm to Ms. Urquizo.

### 4. Ms. Urquizo Sufficiently Alleges Actual Damages that Were Directly and Proximately Caused by Defendants' Actions

"[T]o state a Section 2605 claim, a plaintiff 'must sufficiently allege one of two types of damages:  (1) 'actual damages to the borrower as a result of the failure' to comply with § 2605; or (2) statutory damages 'in the case of a pattern or practice of noncompliance with the requirements' of § 2605."  *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 539 (E.D.N.Y. 2015).  "A plaintiff seeking actual damages under § 2605 must allege that the damages were proximately causes by the defendant's violation of RESPA."  *Id*.  Here, Ms. Urquizo seeks actual damages for Defendants' alleged failures to comply with § 2605 and statutory damages for Defendants' pattern and practice of noncompliance with § 2605.

34

The definition of "actual damages" under RESPA is broad. *Houston v. U.S. Bank Home Mortg. Wis. Servicing*, 505 F. App'x 543, 548 n.6 (6th Cir. 2012).   In *Houston*, the court specifically noted that it found "nothing in the text of § 2605(f), or in RESPA more broadly, to preclude 'actual damages' from including emotional damages, provided that they are adequately proven." *Id*. *See also Tanasi v. CitiMortgage, Inc.*, 257 F. Supp. 3d 232, 270–71 (D. Conn. 2017) (finding that plaintiffs successfully stated a claim for emotional distress damages under RESPA based on allegations that the lender failed to respond to their inquiries regarding loan servicing, causing undue frustration and stress during the foreclosure process).   Actual damages under RESPA may also include expenses, costs, fees, and injuries caused by a servicer's failure to respond properly, "even if incurred before the failure to respond." *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 728 (S.D. Ohio 2014); *Lanton v. Ocwen Loan Servicing, LLC*, 793 F. App'x 398, 401 (6th Cir. 2019).

Ms. Urquizo alleges that she suffered actual damages as a direct result of Defendants' violations of RESPA, including the following:

- **Monetary Losses**: Ms. Urquizo faces significant financial hardship due to the improper fees, penalties, and charges imposed by Defendants' failure to honor the Agreement. These unnecessary expenses strained her already delicate financial situation, leaving her with substantial out-of-pocket costs that could have been avoided had Defendants honored the Agreement.

- **Costs of Drafting and Mailing QWRs/NOEs**: Ms. Urquizo had to repeatedly spend time and money preparing and sending the QWRs and NOEs in an effort to resolve the issues caused by Defendants.   These unnecessary expenses–such as postage, copying,

and other administrative costs–could have been avoided entirely if Defendants had simply acknowledged and addressed the Agreement in a timely and proper manner.

- **Emotional Distress**: The ongoing uncertainty, confusion, and stress caused by Defendants' failure to honor the Agreement has taken a severe emotional toll on Ms. Urquizo.  She endures constant anxiety over the risk of losing her home, emotional anguish from the prolonged financial instability, and the frustration of dealing with Defendants' repeated refusal to correct the situation.  This emotional distress was exacerbated by the looming threat of foreclosure that has hung over her head for years.

(FAC ¶¶ 47, 69, 74, 81–88, 100, 112, and 136).

### 5.  Ms. Urquizo Sufficiently Alleges Statutory Damages

To obtain statutory damages, a plaintiff must establish "a pattern or practice of noncompliance" with RESPA.  12 U.S.C. § 2605(f)(1).  Courts have defined "pattern or practice" as a regular or routine way of operating. *Tanasi*, 257 F. Supp. 3d at 272.  While there is no specific number of violations required to demonstrate a pattern, courts generally hold that two violations are insufficient to support a claim for statutory damages.  *Id*. (collecting cases).  In *Akkus v. Rocket Mortg., LLC*, No. 22-2933, 2024 WL 473733, at *3–5 (D. Md. Feb. 7, 2024), the court elaborated on the meaning of "a pattern or practice of noncompliance," concluding that plaintiffs may allege multiple violations of § 2605 to demonstrate such a pattern.  In *Akkus*, the plaintiff sufficiently pleaded a pattern by alleging, among other things, that the lender failed to reasonably investigate following receipt of a QWR and neglected to respond to inquiries and QWRs on 13 separate occasions.  *Id*. at *5.  The court found that this was sufficient at the pleading stage to show a pattern or practice of noncompliance.

36

Here, Ms. Urquizo has alleged multiple instances of Defendants' violations of RESPA:

- **12 U.S.C. § 2605(e)** – Duty of loan servicer to respond to borrower inquiries.

- **12 C.F.R. § 1024.35** – Error resolution procedures.

- **12 C.F.R. § 1024.38** – General servicing policies, procedures, and requirements.

- **12 C.F.R. § 1024.41** – Loss mitigation procedures.

These allegations, like those in *Akkus*, are sufficient to show a pattern or practice of noncompliance at this stage in the litigation.

### C.  Ms. Urquizo Sufficiently Alleges a Breach of Contract Claim

Defendants argue that no contract existed between Ms. Urquizo and CLS, and argue that any successor servicer had no contractual relationship with her.  However, these arguments are fundamentally flawed.  Ms. Urquizo has sufficiently alleged the existence of a binding contract–the Agreement–which binds both the original servicer, CLS, and the successor servicers, Mr. Cooper and FCI.

### 1.  The Agreement Is a Binding Contract

"In considering whether a binding contract exists, "[t]he first step . . . is to determine whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract.'" *Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 106 (2018) (citations omitted).  The court's analysis should focus on the parties' objective intent as demonstrated by their words and actions.  *Id.* (citing *Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 41 N.Y.2d 397, 399 (1977)).  Rather than emphasizing any single statement or act, the court must consider the totality of the circumstances.  *Brown Bros.*, 41 N.Y.2d at 399–400.  While the courts interpret written instruments, "where a finding of whether an intent to contract is dependent . . .

on other evidence from which differing inferences may be drawn, a question of fact arises." *Id*. at 400.

"If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Kolchins*, 31 N.Y.3d at 106 (citation omitted). "This 'requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement.'" *Id*. (citation omitted). The "'terms of a contract [do not] need [to] be fixed with absolute certainty' to give rise to an enforceable agreement." *Id*. at 107 (citations omitted).

Based on the documentary evidence, namely the Agreement, a reasonable fact-finder could conclude that a binding contract was formed. The Loan Estimate outlines the core terms:  a principal balance of $462, 954.39, a fixed interest rate of 2.875%, amortized over 40 years, and an estimated monthly payment of $2,298. The Acknowledgement of Receipt of Loan Estimate asked Ms. Urquizo to sign below a statement informing her that "[s]igning this acknowledgment does not constitute an obligation on your part to proceed with the transaction *offered* in the Loan Estimate. The Loan Estimate as provided to you expires on May 23, 2022, unless you contact us by May 23, 2022, indicating your intention to proceed with the transaction."  (Emphasis added). The Acknowledgment of Intent to Proceed asked Ms. Urquizo to sign below the statement acknowledging that "[t]the undersigned applicants hereby indicate their intention to proceed with the transaction identified in the Loan Estimate dated May 6, 2022, provided by Community Loan Servicing, LLC."

A reasonable fact-finder could interpret these documents as demonstrating an objective manifestation of CLS's intent to enter into a binding agreement, such that Ms. Urquizo was justified "'in understanding that [her] assent to that bargain [was] invited and [would] conclude

38

it.'" *Kolchins*, 31 N.Y.3d at 107 (citing Restatement [Second] of Contracts § 24 [1981]). In other words, it could reasonably be inferred that CLS made a valid offer through the Agreement. In response, Ms. Urquizo signed all of the documents and returned them to CLS as instructed. *See id*. Affording Ms. Urquizo the benefit of every favorable inference, this exchange–essentially a we "offer" and "I accept," coupled with forward-looking statements about the next steps in their ongoing relationship–sufficiently demonstrates an objective manifestation of an intent to be bound for purposes of surviving a motion to dismiss. *Id*.

### 2. Fannie Mae Permits Simultaneous Assumption and Modification

Fannie Mae explicitly permits the simultaneous assumption and modification of mortgage loans, allowing a successor-in-interest, like Ms. Urquizo, to assume a loan while also modifying its terms. This process is detailed in section F-1-17, "Processing a Transfer of Ownership (04/13/2022)" of Fannie Mae's Servicing Guide (the "Guide").[8] (Wybiral Decl., Ex. P). Central to this process is the concept of an "exempt transferee," which applies to successors, like Ms. Urquizo, who acquire property through certain exempt transfers, such as death, divorce, or inheritance, and who may not need to meet full credit qualification requirements to assume the loan. The Guide provides, in part:

**Completing a Transfer of Ownership**

The servicer must process any transfer of ownership in accordance with *Chapter D1-4, Transfers of Ownership. The servicer must complete the applicable procedure in the following table depending on the type of transaction.* (Emphasis in original).

---

[8] Although CLS references these regulations to support their contrary position, the exhibit they provided–a printout from Fannie Mae's online servicing guide–is incomplete, with important sections cut off and unreadable. This omission prevents verification of the accuracy or relevance of the cited guidelines, undermining CLS's argument and leaving crucial information unclear. *See* Exhibit E to the Certification of Juli Streeter, dated August 2, 2024.

| Type of Transaction | Servicer Action | |
|---|---|---|
| An Exempt Transaction | The servicer must process the transfer of ownership as described in the following table.<br><br>**Note:** Fannie Mae does not require an exempt transferee to assume the mortgage loan *except in connection with a release of liability or in conjunction with a mortgage loan modification.* (Emphasis added). | |

(Wybiral Decl., Ex. O at p. 2).

This is supported by CFPB Bulletin 2013-12 dated October 15, 2013 with the subject Certain Mortgage Servicing Rules. The CFPB writes:

> The following are examples of servicer practices the CFPB would consider to be components of policies and procedures that are reasonably designed to achieve the objections of the success in interest provision:
>
> ***
>
> o Eligibility of the successor in interest to assume the mortgage loan, *with or without a simultaneous loan modification* or other loss mitigation option. (Emphasis added).

The CFPB further notes that "Both Fannie Mae and Freddie Mac require servicers to submit recommendations to them for approval of a *simultaneous mortgage assumption and loss mitigation option*." (Emphasis added). CFPB Bulletin 2013–12, p. 3 (October 15, 2013).[9] *See* Wybiral Decl. Ex. O.

This is precisely why Ms. Urquizo indicated throughout her April 25, 2022 modification application that she would only proceed if she could simultaneously assume and modify the loan. See Wybiral Decl. Ex. B. By conditioning her acceptance on the ability to simultaneously assume

---

[9]    CFPB Bulletin 2013–12 can be found at: https://files.consumerfinance.gov/f/201310_cfpb_mortgage-servicing_bulletin.pdf.

and modify the loan, Ms. Urquizo was acting within the framework clearly established by Fannie Mae.

### 3. Mr. Cooper and FCI Are Bound by the Agreement

Successor servicers, like Mr. Cooper and FCI, are bound by the terms and obligations established by their predecessors. Any servicer enters into contractual agreements on behalf of the investor and a subsequent servicer acts as a new agent for the same principal. *See, e.g. Lewis v. Bank of Am.*, No. CV 13–7717, 2013 WL 7118066 (C.D. Cal. Dec. 18, 2013) (holding denial of existence of loan modification with previous servicer actionable as an unfair business practice); *HomeQ Servicing Corp. v. Hauf*, No. 4:06–CV–83, 2007 WL 196857 (M.D. Ga. Jan. 23, 2007) (court refused to dismiss homeowners' claim against servicer for its repeated and frustrating refusal to honor the forbearance agreement entered into between the homeowners and the previous servicer); *Wright v. Litton Loan Servicing LP*, No. 05–02611, 2006 WL 891030 (E.D. Pa. Apr. 4, 2006) (court found that the servicer continually refused to honor loan modification agreement, repeatedly sent the homeowner "incomprehensible" and unsubstantiated demands for large amounts supposedly due, and failed to respond to homeowner's counsel. Homeowner entitled to actual and statutory damages under RESPA). *See also Estrada v. Caliber Home Loans, Inc.*, 172 F. Supp. 3d 1108 (C.D. Cal. 2016) (subsequent servicer bound by contract with prior servicer; but fact issue here whether contract with prior servicer was enforceable).

Successor servicers, including Mr. Cooper and FCI, are legally bound by the Agreement made by CLS and Ms. Urquizo. When the loan servicing rights were transferred, these successor servicers inherited the obligations under the Agreement. As courts have consistently held, the transfer of servicing rights does not absolve successor servicers from the obligations established

41

by their predecessors, and Ms. Urquizo's rights under the Agreement remain enforceable against them.

### 4.  Defendants' Breached the Agreement

Under New York law, to establish a *prima facie* claim for breach of contract a plaintiff must assert: (1) the existent of an agreement; (2) performance by the plaintiff, (3) breach of the agreement by defendant; and (4) damages.  *See, e.g., RCN Telecom Svcs., Inc. v. 202 Centre St. Realty LLC*, 156 Fed. App'x 349, 350–51 (2d Cir. 2005).  Ms. Urquizo has adequately alleged facts to establish: (i) the existence of an agreement (*i.e.*, the Agreement); (ii) her compliance with the Agreement; (iii) Defendants' breach of the Agreement by, *inter alia*, refusing to modify the loan, returning the loan to installment payments, continuing to charge the pre-offer interest rate of 6.25% rather than the Agreement rate of 2.875%, continuing to charge late fees, property inspection costs, and other default-related fees, and filing a foreclosure action; and (iv) as a result of which Ms. Urquizo has been damaged by the imposition of interest at a rate more than twice that of the Agreement amount, and by the ongoing imposition of default-related fees including fees related to the Foreclosure Action.  Accordingly, Ms. Urquizo has stated *prima facie* a claim for breach of contract.

### D.  Ms. Urquizo Is Entitled to Specific Performance As a Remedy

Ms. Urquizo is entitled to specific performance as a remedy for Defendants' breach of the Agreement.  Under New York law, specific performance is available when a valid contract exists, the plaintiff has fulfilled their obligations, and monetary damages are inadequate to remedy the harm.  *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 415 (2001).

Ms. Urquizo has adequately pled the existence of a binding agreement and demonstrated her compliance by submitting the required paperwork to CLS.  Defendants breached the

Agreement by refusing to honor its terms, despite being bound by their predecessor's obligations. The terms of the Agreement are especially unique, as they were tailored to Ms. Urquizo's situation as a specific point in time, offering favorable terms such as a reduced interest rate and modified loan terms that may no longer be available. These terms were offered relative to the financial circumstances and market conditions when the Agreement was signed, further emphasizing the irreplaceable nature of this specific deal.

Monetary damages alone cannot address the harm Ms. Urquizo faces. Without specific performance, she risks losing her home to foreclosure–an outcome that financial compensation cannot adequately resolve. The Court should compel FCI to honor the terms of the Agreement, ensuring that Ms. Urquizo retains ownership of her home under the revised loan terms.

## CONCLUSION

For the reasons set forth above, Defendants' Motions should be denied in their entirety. In the alternative, Ms. Urquizo requests that the Court grant her leave to amend her Complaint to address any deficiencies identified by the Court.

Dated: Jamaica, New York
September 16, 2024

By:    */s/Leslie Wybiral*
Leslie Wybiral, Esq.
QUEENS LEGAL SERVICES
89-00 Sutphin Boulevard, 5th Floor
Jamaica, New York 11435
lwybiral@lsnyc.org
(347) 592-2200 (main tel.)
(347) 592-2145 (direct tel.)

*Attorneys for Plaintiff Sofia Urquizo*

43